*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

JACQUELYN ANN SHEPHERD,

Defendant-Appellant.

UNPUBLISHED
March 11, 2026
2:24 PM

No. 367514
Jackson Circuit Court
LC No. 2022-000315-FH

Before: KOROBKIN, P.J., and YATES and FEENEY, JJ.

PER CURIAM.

Defendant appeals as of right her jury-trial convictions for (1) operating while intoxicated causing death, MCL 257.625(4)(a); and (2) reckless driving causing death, MCL 257.626(4).[1] The trial court sentenced defendant to serve concurrent sentences of 86 to 180 months' imprisonment. We affirm.

## I. FACTS

This case arises out of a multicar accident, resulting in one death and multiple injuries, caused when defendant drove the wrong way on the highway while intoxicated. On the night of the accident, Michigan State Police (MSP) Trooper Joshua Leddy was dispatched to the hospital to speak with defendant and obtain a search warrant for her blood. Trooper Leddy testified that he spoke with Derrick Ricker outside defendant's emergency room; Ricker claimed to be defendant's brother and reported that he and defendant had two shots of vodka while at Ricker's

---

[1] The jury also convicted defendant of third offense operating while intoxicated, MCL 257.625(9)(c); however, the trial court dismissed that conviction because according to *People v Miller*, 498 Mich 13, 20-26; 869 NW2d 204 (2015), double jeopardy precluded defendant from being sentenced on that count.

house earlier that day. One of the medical professionals who treated defendant also affirmed that he had smelled alcohol on defendant's breath. Trooper Leddy then drafted a search warrant.

Trooper Leddy testified that he received the signed search warrant[2] by fax before proceeding to defendant's hospital room for the blood draw. During the blood draw, Trooper Leddy filled out form FSD-093 (the blood-test form) as well as the blood-tube labels. The blood-test form indicated that the first tube was drawn at 11:30 p.m. and that the second tube was drawn at 11:31 p.m.; however, the labels indicated that the two tubes of blood were drawn at 11:31 p.m. and 11:38 p.m., respectively. The resulting analysis showed 0.151 grams of alcohol per one hundred milliliters of defendant's blood.

Defendant moved to quash the search warrant, which the trial court denied after a combined evidentiary hearing and *Franks*[3] hearing. Defendant then moved to suppress the results of the blood draw, which the trial court also denied after a suppression hearing. Defendant was convicted and sentenced, as stated earlier. Defendant now appeals.

## II. MOTION TO SUPPRESS BLOOD-TEST RESULTS

On appeal, defendant first argues that the trial court erred by denying her request to suppress the blood-test results. We disagree.

## A. PRESERVATION AND STANDARD OF REVIEW

Because defendant moved to suppress the blood-test results in the trial court, this issue is preserved for appellate review. See *People v Serges*, ___ Mich App ___, ___; ___NW3d ___ (2024) (Docket No. 355554); slip op at 5. "We review de novo questions of constitutional law and a trial court's decision on a motion to suppress evidence." *Id*. "We review a trial court's findings of fact at a suppression hearing for clear error." *People v Armstrong*, ___ Mich ___, ___; ___ NW3d ___ (2025) (Docket No. 165233); slip op at 5. "Clear error exists if the reviewing court is left with a definite and firm conviction that a mistake has been made." *Id*. at ___; slip op at 5-6 (quotation marks and citation omitted). In reviewing a trial court's finding of facts, "[w]e examine the facts as they were presented to the trial court at the time of the suppression hearing, not as supplemented by evidence presented at trial." *People v Hammerlund*, 504 Mich 442, 450; 939 NW2d 129 (2019).

## B. OBTAINING THE WARRANT

First, defendant argues that the trial court erred by denying her motion to suppress because there was evidence that her blood draw occurred before Trooper Leddy obtained a signed search warrant. We disagree.

"The Fourth Amendment of the United States Constitution and its counterpart in the Michigan Constitution guarantee the right of persons to be secure against unreasonable searches

---

[2] The search warrant shows it was signed at 11:05 p.m. on the night of the incident.

[3] *Franks v Delaware*, 438 US 154; 98 S Ct 2674; 57 L Ed 2d 667 (1978).

and seizures." *People v Woodard*, 321 Mich App 377, 383; 909 NW2d 299 (2017) (quotation marks and citation omitted). "A search is constitutionally reasonable where the police possess a warrant or the search falls within one of the well-established exceptions to the warrant requirement." *Armstrong*, ___ Mich at ___; slip op at 8. Importantly, an officer must receive proof that a judge or magistrate signed the search warrant before conducting the search. MCL 780.651(5). "[W]hen evidence has been seized in violation of the constitutional prohibition against unreasonable searches and seizures, it must be excluded from trial." *Woodard*, 321 Mich App at 383 (quotation marks and citation omitted).

The crux of this issue is whether Trooper Leddy received the signed warrant before defendant's blood was drawn. See MCL 780.651(5); *Armstrong*, ___ Mich at ___; slip op at 8. The fax machine timestamp on the warrant indicated that the warrant was returned to Trooper Leddy at 11:01 p.m., but the judge's handwritten timestamp indicated that he signed the warrant at 11:05 p.m. Defendant does not dispute that the judge did in fact sign the warrant. Taken together, the evidence presented at the suppression hearing indicated that the warrant was signed and received sometime near 11:00 p.m.

The blood-test form and tube labels also indicated some discrepancy regarding exactly when the blood draw for each tube occurred. Taken together, the documentation indicated that the respective blood draws occurred sometime between 11:30 p.m. and 11:38 p.m.

Muddying the waters regarding the timing of the blood draw were a nurse's notes from the night of the accident. The nurse initially documented that the blood draw occurred at 10:31 p.m., but at the suppression hearing, she testified that she meant to type 11:31 p.m., which was the time that her computer recorded the note. Additionally, although the nurse's notes suggested that officers arrived at defendant's room at 11:01 p.m.—four minutes before the judge's handwritten timestamp—the time that officers arrived at defendant's room does not answer whether the warrant was signed and received before the *blood draw* occurred. This factual distinction is especially relevant given that there were multiple officers involved, but only Trooper Leddy testified that he physically received the faxed warrant.

Accordingly, there was timestamped evidence that the warrant was signed and faxed sometime near 11:00 p.m. and that the blood draws occurred at about 11:30 p.m. to 11:38 p.m. Moreover, the hospital lab technician who performed defendant's blood draw testified that the officers showed her a search warrant, and Trooper Leddy also testified that he showed the search warrant to the other officer and hospital staff members present. An officer testified that the hospital staff members would not begin a blood draw until they were informed that there was an authorized search warrant.

Given the extent of the foregoing evidence, the trial court did not clearly err by finding that a valid warrant was obtained before defendant's blood draw began. MCL 780.651(5); see *Armstrong*, ___ Mich at ___; slip op at 5-6. Accordingly, the trial court did not err by denying defendant's motion to suppress on this ground. See *Armstrong*, ___ Mich at ___; slip op at 8; *Woodard*, 321 Mich App at 383.

## C. WARRANT VALIDITY

Second, defendant argues that the trial court erred by denying her motion to suppress because, even if the blood draw occurred pursuant to the warrant, the warrant was invalid as it relied on Ricker's statements that were later contradicted in his trial testimony. We disagree.

Generally, for a warrant and the resulting search to be valid, "the warrant must be based on probable cause." *People v Hellstrom*, 264 Mich App 187, 192; 690 NW2d 293 (2004). "When reviewing a magistrate's decision to issue a search warrant, this Court must evaluate the search warrant and underlying affidavit in a commonsense and realistic manner." *People v Echavarria*, 233 Mich App 356, 366; 592 NW2d 737 (1999). "This Court must then determine whether a reasonably cautious person could have concluded, under the totality of circumstances, that there was a substantial basis for the magistrate's finding of probable cause." *Id*. at 366-367.

If a defendant establishes by a preponderance of evidence that: (1) an officer made a "false statement *knowingly and intentionally*, or with *reckless disregard for the truth*" in his or her affidavit in support of a warrant; (2) the "false statement [was] necessary to the finding of probable cause"; and (3) the remaining content of the affidavit was insufficient to establish probable cause, then the search warrant must be voided, and the fruits of the search must be excluded. *Franks v Delaware*, 438 US 154, 155-156; 98 S Ct 2674; 57 L Ed 2d 667 (1978) (emphasis added); see *People v Franklin*, 500 Mich 92, 108; 894 NW2d 561 (2017).

In this case, at the combined evidentiary hearing and *Franks* hearing as well as at the suppression hearing, Trooper Leddy testified that after defendant left the emergency room for additional medical treatment, he noticed a man sitting outside defendant's room and initiated a conversation. The man identified himself as Ricker and claimed to be defendant's brother. Trooper Leddy did not verify Ricker's identity. Ricker reported that defendant was at his house from about 4:30 p.m. to about 7:00 p.m. that day, during which time, he and defendant drank two shots of vodka. The accident occurred at approximately 7:50 p.m. that evening. Trooper Leddy drafted an affidavit in support of a search warrant in part on the basis of Ricker's statements. At trial, Ricker testified that although he was defendant's friend, he told the nurses that he was defendant's brother in order to get access to her room. Ricker then denied that he ever spoke with the MSP trooper present in defendant's room.

Crucially, Ricker did not testify at either the combined evidentiary hearing and *Franks* hearing or at the suppression hearing. As previously stated, in reviewing a trial court's finding of facts regarding a motion to suppress evidence, "[w]e examine the facts as they were presented to the trial court at the time of the suppression hearing, not as supplemented by evidence presented at trial." *Hammerlund*, 504 Mich at 450. Therefore, we do not consider Ricker's eventual trial testimony in our review. See *id*. Absent Ricker's trial testimony, the only evidence presented at or before the suppression hearing regarding the conversation between Ricker and Trooper Leddy was Trooper Leddy's testimony regarding the conversation and another officer's testimony that he saw Trooper Leddy speak with a man who claimed to be defendant's brother. Accordingly, there was no evidence presented at or before the suppression hearing to suggest that Trooper Leddy lied about speaking with Ricker or acted with reckless disregard for the truth by believing Ricker's statements. See *Franks*, 438 US 155-156.

Trooper Leddy drafted the search warrant after: (1) Ricker stated that defendant drank two shots of vodka earlier that night, and (2) one of the medical professionals stated that he smelled alcohol on defendant's breath. Taken together, this information displays that sufficient probable cause existed to issue the search warrant. See, e.g., *People v Cords*, 75 Mich App 415, 424; 254 NW2d 911 (1977). Accordingly, the trial court did not err by denying defendant's motion to suppress on this ground. See *Armstrong*, ___ Mich at ___; slip op at 8; *Woodard*, 321 Mich App at 383.

## D. TIMING DISCREPANCIES

Third, defendant argues that the trial court erred by denying her motion to suppress because there were discrepancies regarding the time that defendant's blood was drawn. We disagree.

The Michigan Vehicle Code, MCL 257.923 *et seq.*, requires that a blood test "be taken and collected in a reasonable manner." MCL 257.625a(6)(c). This Court has outlined a list of requirements that the party seeking admission of blood-test results must establish, including that the blood was timely taken and labeled. *Cords*, 75 Mich App at 427 (quotation marks and citation omitted). This Court has explained that these requirements "were designed to insure that the blood tested was in fact that of the accused and to prevent the admission of test results obtained from an unreliable blood sample." *Id.* at 428. Accordingly, if testimony offered at trial fulfills the purpose of demonstrating that the sample was reliable and obtained from the defendant, then the blood-test results may be admitted, even if every criterion was not established. *Id.*

At the suppression hearing, the trial court found that any inconsistencies in the recorded times of the blood draw were due to difficulties regarding defendant's resistance to the blood draw. At trial, the lab technician who performed defendant's blood draw described the room as "chaotic almost." She explained that she actually collected three tubes of blood, but she had to discard the second tube as a biohazard because defendant jerked her body, stopping the blood collection before the tube was able to be filled completely. Therefore, the third tube became the second *full* tube of blood tested. Trooper Leddy, who was also assisting in holding defendant down for the blood draw, recorded the time of each draw. Ultimately, three distinct times within a 10-minute window were recorded in reference to the two tubes that were sent to the lab: 11:30 p.m., 11:31 p.m., and 11:38 p.m. The MSP forensic lab technician who prepared defendant's sample for alcohol analysis testified that, if the time difference between the blood-test form and the tube labels had been concerning, then she would have paused the testing process and consulted a supervisor who would decide if the test could continue; however, she did not find the time difference in this case concerning enough to do so.

Taken together, this information supports a finding that the time discrepancies did not render defendant's blood draw and test unreasonable or unreliable. See MCL 257.625a(6)(c); *Cords*, 75 Mich App at 428. And defendant does not dispute that the tested blood was her own. See *Cords*, 75 Mich App at 428. Accordingly, the trial court did not err in ruling that a sufficient foundation had been laid for the admission of the blood-test results. *Id.*

### III. SENTENCING

Defendant further argues that the trial court abused its discretion by sentencing defendant at the top of the guidelines recommendation. We disagree.

### A. PRESERVATION AND STANDARD OF REVIEW

"There are no special steps that a defendant must take to preserve the question whether the sentence was proportional[.]" *People v Walden*, 319 Mich App 344, 350; 901 NW2d 142 (2017). "[C]hallenges to within-guidelines sentences are reviewed for reasonableness according to the test outlined in [*People v Steanhouse*, 500 Mich 453; 902 NW2d 327 (2017)]." *People v Posey*, 512 Mich 317, 326; 1 NW3d 101 (2023) (opinion by BOLDEN, J.). The reasonableness of a sentence is reviewed "for an abuse of discretion informed by the 'principle of proportionality' standard." *Steanhouse*, 500 Mich at 476. A trial court abuses its discretion if the defendant's sentence is not "proportionate to the seriousness of the circumstances surrounding the offense and the offender." *Id*. at 459-460 (quotation marks and citation omitted).

### B. ANALYSIS

"[The Michigan] principle of proportionality requires sentences imposed by the trial court to be proportionate to the seriousness of the circumstances surrounding the offense and the offender." *Id.* at 474 (quotation marks and citation omitted). A within-guidelines sentence is presumed to be proportionate. *Posey*, 512 Mich at 360. "[T]he defendant bears the burden of demonstrating that their within-guidelines sentence is unreasonable or disproportionate . . . ." *Id*. at 359. "A defendant may overcome the presumptive proportionality of a within-guidelines sentence by presenting unusual circumstances that would render the presumptively proportionate sentence disproportionate." *People v Ventour*, 349 Mich App 417, 430; 27 NW3d 660 (2023) (quotation marks, citation, and alternation omitted). Unusual circumstances are defined as "uncommon, not usual, rare." *Id*. (quotation marks and citation omitted).

Additionally, "[a] trial court must articulate its reasons for imposing a sentence on the record at the time of sentencing." *People v Conley*, 270 Mich App 301, 312; 715 NW2d 377 (2006). A trial court's clear reliance on the sentencing guidelines supports that the articulation requirement was satisfied. *Id*. at 313.

In this case, defendant's recommended minimum sentencing range was 43 to 86 months' imprisonment, and as previously stated, the trial court sentenced defendant to serve 86 to 180 months' imprisonment. The parties do not dispute that defendant's sentence falls within the recommended minimum sentencing range. Therefore, defendant's sentence is presumed to be proportionate, and defendant bears the burden of proving otherwise. *Posey*, 512 Mich at 359-360.

Defendant first argues that the trial court failed to articulate an explanation for defendant's sentence because it only stated that the deceased victim's family had a "high price" to pay as a result of the accident. But the trial court also stated that it considered: (1) the presentence investigation report (PSIR), (2) the facts established on the record, (3) the contents of the court file, (4) the sentencing guidelines, (5) the existence of any mitigating or aggravating factors, and (5) the victims' statements shared at the sentencing hearing. The trial court's clear reliance on the sentencing guidelines alone supports that the trial court fulfilled the articulation requirement. See

*id*. And by considering the victims' statements and the personal information contained in the PSIR, the trial court clearly considered "the seriousness of the circumstances surrounding the offense and the offender." *Steanhouse*, 500 Mich at 474 (quotation marks and citation omitted). Therefore, we conclude that the trial court adequately articulated the explanation for its sentence on the record. See *Conley*, 270 Mich App at 312-313.

Defendant further argues that her sentence was disproportionate because she did not act with "any level of malice or ill will." But defendant provided no support that her lack of malice was in any way "uncommon, not usual, [or] rare" such that a within-guidelines sentence was unusual or disproportionate. See *Ventour*, 349 Mich App at 430 (quotation marks and citation omitted). Neither of defendant's convictions required a showing of malice. See MCL 257.625(4)(a); MCL 257.626(4); *People v Schaefer*, 473 Mich 418, 430; 703 NW2d 774 (2005). Additionally, the inherent nature of a car accident suggests that under *usual* circumstances the actor had no malice, as "accident" is defined as "[a]n unintended and unforeseen injurious occurrence[.]" *Black's Law Dictionary* (12th ed).

Defendant also argues that her sentence was disproportionate because her previous misdemeanors for operating while impaired occurred nearly 20 years before the accident in this case. Yet, MCL 257.625(9)(c) anticipated such a scenario and explicitly states that a defendant's prior convictions are to be considered "regardless of the number of years that have elapsed . . . ." Defendant again provided no support that the passage of time was in any way "uncommon, not usual, [or] rare" when the governing statute expressly anticipates such a scenario. See MCL 257.625(9)(c); *Ventour*, 349 Mich App at 430 (quotation marks and citation omitted).

Accordingly, we conclude that defendant has failed to meet her burden of demonstrating that her within-guidelines sentence is disproportionate. See *Posey*, 512 Mich at 359.

Affirmed.

/s/ Daniel S. Korobkin
/s/ Christopher P. Yates
/s/ Kathleen A. Feeney